**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**(Houston Division)**

| | |
|---|---|
| **DEIDRA GENTRY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No.** |
| ) | |
| **ENCOMPASS HEALTH** ) | |
| **REHABILITATION** ) | |
| **HOSPITAL OF PEARLAND, LLC and** ) | |
| **ENCOMPASS HEALTH** ) | |
| **CORPORATION** ) | |
| ) | |
| **Defendant.** | |

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

Plaintiff Deidra Gentry ("Plaintiff"), by her undersigned attorneys, hereby allege as follows:

### VENUE AND JURISDICTION

1.     This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3730(h)(c)

2.     Venue is proper in this district pursuant to 28 U.S.C. § 139l(b) and (c) and 31 U.S.C. § 3732(a).  Defendant was doing business in this district during the relevant time period, and the claims set forth in this Complaint arose, at least in part, in this district.

3.     Plaintiff Deidra Gentry is a United States citizen and a resident of the State of Texas who worked for Defendant Encompass (Pearland) beginning on October 5, 2022;  witnessed numerous instances of fraudulent practices adopted by Defendant that violated the False Claims Act and was terminated for reporting the same it.

1

4.        Defendant Encompass Health Rehabilitation Hospital of Pearland, LLC provides inpatient rehabilitation ("IRF") services in the Houston area.

5.        Defendant Encompass Health Corporation owns Encompass Health Rehabilitation Hospital of Pearland, LLC and terminated Plaintiff as a result of reporting FCA violations to it.

## LAW

6.        The False Claims Act (FCA) provides in pertinent part that:

Any person who (A) knowingly presents, or causes to be presented a false or fraudulent claim or payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of [the Act]; ... or (g) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the  Government

***

is liable to the United States Government for a civil penalty of not less than $12, 537 and not more than $25, 076 plus 3 times the amount of damages which the Government sustains because of the act of that person.  For purposes of this section, the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud. 31

U.S.C. § 3729. 42 U.S.C. § 1320 (a)-7(b) ("the Federal Anti-Kickback Act), prohibits a person or firm from providing or soliciting remuneration as an inducement for referrals of Medicare, Medicaid, or other healthcare program patients. 42 U.S.C. § 1395 (nn) prohibits self- referrals, and more specifically prohibits a physician from making certain referrals to entities with which the physician has a financial relationship. Claims submitted to federal healthcare programs based on referrals obtained in violation of the Anti- Kickback Act are false claims under the False Claims Act and all amounts paid by these programs as reimbursement for such claims constitute damages under the False Claims Act.

## PLANS

### Medicare

7.      Medicare is a government financial health insurance program administered by the Social Security Administration of the United States.  Medicare was promulgated  to provide payment for medical services, durable medical equipment, and other related health-related items for individuals 65 and over. Medicare also makes payments for certain health services provided to additional classes of individual health care patients under federal regulations. The United States, through the Department of Health and Human Services ("HHS") and its component agency, the Centers for Medicare and Medicaid Services ("CMS"), administers the Medicare Part A and Medicare Part B programs. Generally, hospitals are reimbursed through the Medicare Part A program, and physicians are reimbursed through the Medicare Part B program.

8.      Hospitals, skilled nursing facilities, home health agencies, hospices, and physicians who participate in the Medicare program, as well as other federal health care programs,

are required to enter into contracts or "provider agreements" with HHS. Under the terms of these provider agreements, hospitals, physicians, hospice providers, skilled nursing facilities, and other participating healthcare providers certify that they will comply with all laws, regulations, and guidance concerning proper practices for Medicare providers. Compliance with these provider agreements is a condition for participation in and receipt of payments from the Medicare program. Therefore, providers such as Encompass must comply with the requirements of the Medicare and Medicaid programs to be eligible to receive payments from these programs for rehabilitative services.

   9.   Section 4421 of the Balanced Budget Act of 1997 modified how payment is made for IRF services by creating Section 1886(j) of the Social Security Act, which authorized implementing a per-discharge prospective payment system of IRFs such as those operated by Encompass. The IRF PPS payment for each patient is based on information found in the IRF Patient Assessment Instrument (PAI), which contains patients' clinical, demographic, and other information and classifies the patients into distinct groups based on clinical characteristics and expected resource needs. As of July 1, 2006, the Medicare, Medicaid, and SCHIP Extension Act of 2007 (Public Law 110-173) stipulated that the compliance threshold should be set no higher than 60 percent, which is now referred to as the "60 percent rule." The SS Act also stipulated that comorbidities that meet certain criteria as specified in 42 C.F.R. 412.23(b)(2)(i) must continue to be used to determine the compliance threshold.

   10.   Since May 7, 2004, 13 medical conditions qualify for the 60 percent rule and include stroke, burns, spinal cord injury, major multiple trauma, congenital deformity,

amputation, fracture of the femur (hip fracture), brain injury, systemic vasculitis, with joint involvement, advanced osteoarthritis, knee or hip replacement, and neurological disorders (including multiple sclerosis), motor neuron disease, polyneuropathy, muscular dystrophy, and Parkinson's disease.  Compliance percentage: This is the percentage of an IRF's total inpatient population that meets at least one of the medical conditions listed as 42 C.F.R. 4l 2.23(b)(2)(ii).  Reasonable and necessary criteria for determining the reasonableness of IRF claims: Under Section I 862(a)(1) of the SS Act, effective for discharges that occur on or after January 1, 2010, claims for reasonable and necessary services are assessed under criteria that includes the key decision points considered and documented when making a decision to admit, retain or discharge a IRF patient; certain preadmission assessment requirements; a post- admission physician evaluation to verify that the beneficiary's preadmission assessment information remains unchanged or to document any changes; and specific requirements for an individualized overall plan of care for each individual.

11.     Among the criteria for determining the reimbursement for admission into the IRF and for the provision of reasonable and necessary therapy and rehabilitative services under the SS Act, the IRF must determine that a beneficiary is sufficiently medically stable to benefit from IRF services; needs the coordinated care of multiple therapy disciplines uniquely provided in IRFs; needs the coordinated care of multiple therapy disciplines uniquely provided in IRFs; benefits from the intensity of rehabilitation therapy services uniquely provided in IRFs; requires close medical supervision for the management of medical conditions to support participation in an intensive rehabilitation therapy program; and possesses the cognitive ability to understand commands and retain information.

12.     For an IRF claim to be paid by the government for Medicare and Medicaid

claims, there must be a "reasonable expectation" at the time of admission that the patient meets IRF "coverage criteria."  42 CFR & 412.622 (a)(3).  The "coverage criteria" generally require that the patient (1) can "reasonably be expected to actively participate in, and benefit from, an intensive rehabilitation therapy program," and (2) requires "physician supervision by a rehabilitation physician." The government also requires documentation of a preadmission screening and concurrence of the rehabilitation physician with that screening.  42 CFR § 412.622(a)(4).  The licensed or certified clinician/clinicians conducting the preadmission screening/narrative  must write out the detailed reasoning/justification for the IRF admission on the preadmission screening documentation.  The rehabilitation physician is required to review and concur with this reasoning/justification.  The government has clarified that IRF admission requires a level of physician judgment that cannot be delegated to a physician extender.

13.    In sum, patients should only be admitted when they meet the criteria specified in the previous paragraphs. IRF care is only considered by Medicare to be reasonable and necessary under 1862(a)(1)(A) of the Social Security Act if the patient meets all of the requirements outlined in 42 CFR §§412.622(a)(3), (4), and (5) and 74 Fed.Reg.39762, 39788 (Aug.7, 2009).  No Medicare payment may be made for items or services that are not reasonable and necessary for diagnosing or treating illness or injury or for improving the functioning of a malformed body member (the Act § 1862(a)(1)(A)).  When patients are improperly admitted because they do not meet the criteria and the criteria are falsified in order to qualify for payment of a claim, any such falsification for admission is a precursor to a false claim, and all requests for payment for such patients are false claims under the FCA.

**FRAUDULENT SCHEME**

14.        Defendant Encompass Health Rehabilitation Hospital of Pearland, LLC, is owned by Encompass Health Corporation, the leading provider of inpatient rehabilitation services and has decades of experience in the field.

15.        On or about October 2022, Plaintiff was hired by Encompass Health Rehabilitation Hospital of Pearland, LLC ("Encompass") to solicit rehab referrals for admission to various hospitals including but not limited to the Encompass Health Rehabilitation Hospital of Pearland, LLC, Encompass Health Rehabilitation Hospital of Sugar Land, LLC,  Encompass Health Rehabilitation Hospital of Cypress, LLC,  Encompass Health Rehabilitation of Humble, LLC, and Encompass Health Rehabilitation Hospital of Katy, LLC.

16.        During her training at Encompass Health Rehabilitation Hospital of Pearland, LLC, in October 2022, Plaintiff observed a peculiar process that differed significantly from her prior experiences in healthcare sales at various companies spanning almost twenty years.

17.        Unlike conventional practices, sales representatives were prevented from accessing and receiving written materials describing the role of sales representatives in the admission process. In addition, sales representatives like Plaintiff, who lacked a clinical background, received training on how to operate as clinical screeners.   In fact, Encompass provided the sales representatives with directives on how to tailor clinical language and make clinical judgments in order to generate patient admissions.

18.        During Plaintiff's first week of training, Novia Mearidy, the Business Development Director at the Pearland hospital location, instructed Plaintiff how to target patients and how to go through the patient's progress notes from their hospital stay or home care and input

medical justifications that ensured acceptance into this particular Encompass hospital. Plaintiff was provided written medical scripts by Mearidy in order to guarantee acceptance as well. Plaintiff was also told by her, *inter alia*, to input that the patient required three disciplines offered by Defendant and to input in her clinical narrative that the patient "required treatment" for an ailment if they complained about an ailment that could be related to a qualifying condition although she was in no position to make this clinical determination. Mearidy also asked Plaintiff to relate as many complaints as possible to conditions such as a stroke, as it would generate a basis for admission to the hospitals as well as higher reimbursements.

19.    Although Plaintiff was aware that Medicare allowed nonclinical personnel to collect data, she was concerned about Medicare's prohibition against nonclinical personnel performing clinical screens, which entailed analyzing medical charts and exercising clinical judgment to generate a clinical narrative that determined a course of treatment/admission stay.

20.    Encompass attempted to circumvent this problem by having the sales representatives provide these misleading narratives and then have the rehabilitation physicians certify/adopt the same. Indeed, once the sales representatives, who were incentivized by quota, performed prescreens/clinical narratives, Mearidy would instruct the sales representatives to send out requests through an electronic module to get Encompass's rehab physicians to rubber stamp these misleading entries on the same day and often near the same time. Mearidy emphasized to plaintiff that the clinical narratives generated by the sales representatives were relied upon by the physicians for admission purposes and the purpose of this process was to minimize the number of beds that remained empty after the current patients were discharged almost daily.

21.    Also, Mearidy's written directives were to "ask for same day MCR (Medicare)

8

referrals from home" although this type of segregation is also prohibited by Medicare. Again, to avoid detection, the Pearland hospital refused to allow the sales representatives to possess these directives outside of the facility.

22.     Defendant's aforementioned admission process clearly defeated the purpose of having those with clinical backgrounds perform the prescreen as required by Medicare. Here, Encompass' physicians would have to rely on the compromised input of the sales representatives who were motivated by heavy sales quota/pressures to provide the medical clinical justification to cause admissions and just as importantly, they were unqualified to do so. In addition, Encompass' rehab physicians often had no practical ability to even evaluate the flawed justifications provided by the sales representatives because the modules would illustrate that the certifying physicians would be bombarded by several requests from sales representatives in very short times to certify the admissions such that plaintiff witnessed certifications being electronically entered within one minute of the requests. Therefore, it was often practically impossible to review the clinical justifications of the patients for admissions purposes in that time frame even if the narratives contradicted Medicare's requirements for admissions and even if the narratives had been generated by individuals with a clinical background.

23.     Apparently, the CEO of the Pearland hospital, Michael Cabiro recognized that the aforementioned scheme could be uncovered by Medicare auditors/regulators. To circumvent this, he plainly reminded the sales representatives, including the plaintiff, and the certifying physicians, that the times upon which the physician's adopted the clinical narratives be spread out in order to fly under the radar of Medicare regulators.

24.     Plaintiff learned that she and each of Encompass's sales representatives were

trained to take this approach in order to cause admissions to the other hospitals listed in this complaint and that Medicare was routinely billed based on the implementation of this process at these hospitals. Eventually, Plaintiff received complaints from onsite clinicians at the Pearland Hospital on or about November 2022, that that the hospitals were repeatedly admitting patients who lacked medical justification due to the sales representatives' clinical narratives and the physician's certifications of the same.

25.     As time passed, plaintiff even received feedback from the Pearland compliance auditor on or about December 2022, that patients were repeatedly admitted without medical justification. Rather than inform the sales representatives to discontinue making clinical narratives that were simultaneously adopted by the rehab physicians, the auditor instructed her and others on how the sales representatives should better extract certain magic language that would justify the bogus admissions.

26.     Undeterred by plaintiff's and others expressed concerns, Mearidy demanded that her sales representatives, including plaintiff, continue to meet sales quota and skirt Medicare guidelines for reimbursement by also omitting any language in their clinical narrative that made admissions to their hospitals inappropriate. In fact, on or about November 2022, at the behest of Mearidy, a patient named M. Harris with a date of birth of 1/8/1941, was admitted for skilled nursing services for 12 days. However, M. Harris (Patient #58062) was a "psych" patient who had expressed she was unable to participate in daily therapy prior to admission. Still, Medicare was billed approximately $20,000 based on (plaintiff's) prescreen/clinical narrative and the certification by Dr. Natasha Rose (Medical Director). The medical notes charts for this patient prior to admission clearly demonstrated that the patient refused therapy although the Medicare

guidelines for this patient required that she be able to complete a minimum of fifteen hours of therapy per week.  After admitting this patient with no medical necessity and no ability to benefit from treatment into the Pearland facility, Encompass refused to discharge prior to billing Medicare in the aforementioned amount her even after the medical chart indicated that this patient would not leave her room nor participate in any treatment modality immediately following the admission.

27.        In addition, on or about, February 23, 2023, patient J.V. was admitted into the Pearland facility based on the submission /clinical narrative of plaintiff.  Ultimately, the patient caused the Government/Medicare to pay roughly $1,000 per day for this patient.

28.        In addition, on or about November 2, 2022, Medicare was billed for 62 y/o patient 125956 based on the narrative of sales representative counterpart S.L. who claimed this patient required intensive therapy at the Encompass Health Sugarland Hospital, LLC

29.        Plaintiff discussed these observations with counterparts who had similar concerns that Defendant was causing fraudulent admissions/government reimbursements and one counterpart jokingly remarked about the potential for jail time in carrying out the directives of Encompass.

30.        After Plaintiff complained to management about the aforementioned violations on or about February 2023, she was ignored.  Then, on or about March 2023, Plaintiff complained to in-house counsel Dawn Rock of Encompass Health Corporation, that the Encompass process described above caused the submission of false claims. Plaintiff also offered to provide the same level of specificity regarding the aforementioned violations to Mrs. Rock that she had already provided to management.  Mrs. Rock redirected her complaints to management and within days,

plaintiff was terminated despite the fact she had received glowing remarks from management just prior to her complaints.

### COUNT 1-31 U.S.C. §3730h

(Retaliation).

1.       Plaintiff re-alleges and incorporate by reference paragraphs 1 through 30 as though fully set forth herein.

2.       This is a claim under the False Claims Act, 31 U.S.C. §§ 3730 h, as amended.

3.       Both Defendants violated the anti-retaliation provision of this act as Plaintiff came forward with the fraudulent scheme and therefore had knowledge of it.

4.       Both Defendants engaged in acts of furtherance of an action under this section described herein.

5.       Both Defendants knew that Plaintiff engaged in an activity protected under the statute and terminated Plaintiff as a result.

6.       Plaintiff asks for full damages pursuant to the statute as well as its attorneys fees.

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a Jury as to all issues and counts so triable as a matter of right.

Respectfully submitted this the 20th day of March, 2025

*/s/Volney Brand*
**Volney Brand Law PLLC**
3626 N Hall, Ste 610
Dallas, TX 75219
Telephone: 214-932-1472
Fax: 214-932-1473

-AND-

Keith B. French
**KEITH B. FRENCH LAW, PLLC**
2734 Sunrise Blvd., Suite 304
Pearland, TX 77584
kfrench@peoplefirstfirm.com
Tel: 832-243-6153
Fax: 832-243-1927